## DECLARATION OF RIZWAN RAJA

RIZWAN RAJA declares pursuant to 28 U.S.C. § 1746 under penalty of perjury that the foregoing is true and correct:

1. I submit this declaration opposition to the allegations of misconduct made by letter dated February 28, 2019 from OATH First Deputy Commissioner John W. Burns.

2. By way of background, I am 47 years old and a resident of Nassau County. I was born and raised in Pakistan. After earning degrees in both law and accounting, I immigrated to the United States in 1996 and gained my United States citizenship in 2002.

3. I am currently employed at a registered representative (sometimes called an industry representative) in OATH-Taxi and Limousine Tribunal (the tribunal), where I specialize in representing taxi drivers and other for-hire vehicle drivers. I have served as registered (or industry) representative for 14 years.

4. I am the sole breadwinner for his wife and four children, the oldest of who is in college.

5. I speak Urdu, Hindi and Punjabi as well as English. This ability benefits my taxi driver clients, as more than 45 percent of yellow taxi drivers were born in South Asia. TLC 2018 Taxicab Factbook at 15.

6. In addition to serving my clients, since 1998, I have served on the organizing committee of the New York Taxi Workers Alliance (NYTWA), an advocacy group for yellow cab, green car, black car, livery and app-dispatched drivers..

7. Prior to my career as an registered representative, I worked for the Bank of New York, for MetroPlus, an HMO company, and as a yellow taxi driver.

8. I became a registered representative at the TLC Tribunal in 2005. In order to be named a representative at that time, applicants were required to sit for and pass an examination,

1

demonstrating their knowledge of TLC rules and procedures. Approximately 18 applicants sat for the exam along with me. Just three passed. Ex. 3.

9. Though representatives are not lawyers, they may appear for clients in what is now known as the OATH TLC Tribunal.

10. The rules governing TLC drivers, while meant to be in plain English, are fairly voluminous. Chapter 80 of the TLC Rules, which pertains to taxi and for-hire vehicle drivers, combines the previous chapters 54 and 55 and extends to 62 pages. Chapter 58, which covers the obtaining of taxicab license and rules for operating a taxicab, is 108 pages. Chapter 68, which pertains to adjudications, suspensions, revocations and the seizure of unlicensed vehicles, is 23 pages long. There are also NYC Administrative Code provisions that govern taxi drivers. And there are Code provisions and rules that govern non-TLC drivers who engage in unlicensed activities.

11. The penalties for violating TLC rules can be substantial. To cite a few examples, mandatory fines for refusing service range from $350-$1000. TLC Rule 80-02(e). Fines for overcharging a passenger less than $10 are in the same range. But if the overcharge exceeds $10, the driver's license will be revoked. TLC Rule 80-02(e)(1). Bribery or failure to report bribery can result in a $10,000 fine and revocation of a license. TLC Rule 80-12(e). "Acts Against the Public Interest" can merit a fine of up to $350 plus a suspension of up to 30 days. TLC Rule 80-12(d). Reckless driving can result in a fine of $350-$1000. TLC Rule 80-14(a). Using a cell phone can lead to a $350 fine (or $250 if the drive pleads guilty. TLC Rule 80-14(e). Failing to "comply with all reasonable and lawful routing requests of the Passenger" can result in a $150 fine (or $100 if the driver pleads guilty). TLC Rule 80-16.

12. There are, of course, many other rules covering all aspects of driving a taxi and serving passengers. In addition, TLC courts may adjudicate traffic law violations, which can result in fines plus "points" on a license. TLC Rule 80-13.

13. Beyond individual rules, the TLC Rules impose additional penalties on drivers for accumulating points based on individual violations. A driver who accumulates ten or more points within a 15-month period may have his or her license revoked. Application of this Rule can be complicated in that "When determining whether a suspension or revocation is required based on the accumulation of points in a 15-month period, the Commission will count backwards 15 months from the date of the most recent conviction for the violation carrying points that is cited in the summons under this section." TLC Rule 80-17.

14. At least 15 separate rules in Chapter 80 alone can lead to revocation. More than 25 rules permit suspension of a license. In addition to the rules, there is case law by OATH judges and TLC-OATH judges that is made available through searchable online databases maintained by OATH and the Center for New York City Law.

15. Taxi driver respondents at the tribunal may appear without counsel. But given the complexity of the rules, the magnitude of the fines and the possibility of suspension or revocation, many seek assistance.

16. If they retain counsel, either a lawyer or an registered representative, they must do so at their own expense. A large majority of the persons who regularly appear in the tribunal are representatives, not lawyers.

17. Most taxi drivers are first generation immigrants, whose first language is likely not English.

18. Since 2010, I have handled 20,000 cases, which I know because I track every case on a ticketing management system, which tracks former clients and their prior cases and results. To be sure, only a minority of these cases results in hearings with the rest being resolved by settlement.

19. About 70% of my cases come from referrals by NYTWA, whose members pay me a discounted fee.

20. In addition to hearings, I submits appeals, which tend to be brief, written arguments submitted through the tribunal website. Some of these appeals are on cases where I conducted the hearing. Other appeals are in matters where I did not appear at the hearing phase, but am able to review what occurred at the hearing by listening to audiotapes that the tribunal makes available.

### The Charges and the Summary Suspension

21. Throughout my entire career, I had never been accused of misconduct of any kind until I received an e-mail from OATH Assistant General Counsel Timothy Jones on March 1.

22. The summary suspension that OATH would impose on me is open-ended as there is no time limit in the OATH rules for ALJ Burns to decide whether any additional suspension is warranted (or whether the summary suspension itself was proper).

23. The charges against me are false.

24. The summary suspension letter, which was attached to the e-mail, accuses me of not registering as a representative for calendar year 2016. In fact, I did register. My registration form for that that calendar year, signed by me on December 21, 2015 is attached as Ex. 4.

25. ALJ Burns accuses me with violating OATH Rule 6-25(a)(2) by using a vulgar term in a moment of frustration to describe a clerk with whom he had a difficult relationship. This remark was not made to the clerk, but was allegedly in earshot of another tribunal

employee. I recall making this remark under my breath, not to the clerk and I did not intend it to be overheard (though apparently it was). It was not during, in or about a proceeding. The remark, while perhaps rude and regrettable, was uttered in a waiting area and concerned difficulties with a clerical staff member. It did not disrupt a proceeding (or any other operation) of the tribunal.

26. The charge that I misrepresented my credentials is equally baseless. The affiant Mohammad Siddiquee, who makes that claim also says that I gave him my business card. That card identifies me as an industry representative, not a lawyer. Ex. 5.

27. I never called myself a lawyer or introduced myself a lawyer.

28. It is, of course, quite possible that Siddiquee simply misremembers the conversation as he says it occurred in November 2016 when he met me for the first time, though his affirmation is dated January 19, 2018, over a year later. Siddiquee also says that I was interacting with other drivers. Perhaps Siddiquee simply assumed I was a lawyer because he saw me advising clients.

29. The charges that I misappropriated funds are based on affirmations by former clients that I accepted money to file three appeals that I did not file. These charges are false as I did not appropriate any client's funds.

30. In Siddiquee's case, I did discuss his filing of an appeal for a violation that had already been adjudicated and quoted him a fee. But as I recall and as my notes indicate, Siddiquee never paid the agreed fee so I did not prepare the appeal. (It often happens that a driver will discuss a case with one representative of attorney only to change his mind and hire other counsel or no counsel.) A copy of my notes concerning my interaction with Siddiquee and indicating that there was no payment is attached as Exhibit 6. In order to triple check these facts,

I reviewed by bank records both online and at a branch. Those records show no deposit of Siddiquee's check.

31.    Concerning Saiful Alam, I did agree to file the appeal, but I was not able to do so due to a sudden change in the appeals tribunal practice.

32.    I took the first step, which was to order an audiotape of the hearing at which I did not appear. For reasons unknown, the audiotape was delayed.

33.    Until that time, the tribunal's practice had been to permit a late filing of the appeal when the audiotape had been ordered but not produced. In this event, however, the court refused to permit a late filing.

34.    To make good on the fee that Alam paid, I offered to appear in two new matters free of charge, which I did.

35.    In Kwaku Adu's case, the driver had been cited for running a red light based as shown by on a red light camera. *See* Ex. 7.

36.    In such cases, vehicle owners are served summonses by the Department of Transportation / Parking Violations Bureau. TLC-licensed drivers (even if not the owner) may also be cited by the TLC. Where the driver is the vehicle owner, the TLC OATH appeals tribunal had been dismissing such summonses on double jeopardy grounds. Thus my practice was to check whether the respondent was the owner of the vehicle in question. When I checked with the OATH clerk, I was told that Mr. Adu did not own the vehicle, which meant there was no viable ground for an appeal. Thus, my contemporaneous note states: "Not an owner driver. Appeal can't be filed." Ex. 6. Moreover, I did not "appropriate" the fee. I returned it, as Mr. Adu himself states in paragraph 12 of his affirmation and which is reflected in my notes. Returning the money

6

itself defeats any misappropriation charge. Nor did I take "eight months" to do so as the summary suspension letter alleges. According to Mr. Adu, I accepted the fee in December on 2017 and returned it the following month. Adu Aff. ¶¶ 7-11. I believe I did nothing wrong in this case as it would have been improper to file what appeared to be a frivolous appeal.

37. Beyond the factual inaccuracies underlying the "appropriation" charges, the summary suspension letter does not alleged that my claimed dishonesty will adversely affect my practice before the tribunal. At most, the charging letter claims neglect or a mistake, not a lack of integrity. And it does not allege that these mistakes were intentional, pervasive or even repeated. I did not misappropriate funds and any mistake I may have made was not caused by dishonesty.

38. Finally, the suspension letter's allegation that I submitted a "false statement to the Tribunal," Ex. 2 at 2, is not supported by any statement or evidence of any kind.

I, Rizwan Raja, affirm under penalty of perjury that the foregoing facts are true. False statements made herein are punishable as a Class A Misdemeanor pursuant to section 210.45 of the NYS Penal Law.

Dated: Queens, NY
   March 14, 2019

_____
Rizwan Raja